**Signed and Filed: December 4, 2017**



_____
**DENNIS MONTALI
U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>GABRIEL TECHNOLOGIES CORPORATION, a Delaware Corporation, and TRACE TECHNOLOGIES LLC, a Nevada Limited Liability company,<br><br>      Administratively<br>      Consolidated Debtors.<br>_____<br>QUALCOMM INCORPORATED, a Delaware Corporation,<br><br>      Plaintiff,<br><br>v.<br><br>NORTH WATER INTELLECTUAL PROPERTY FUND L.P. 3A, a limited partnership organized and existing under Delaware, et al.,<br><br>      Defendants.<br>_____ | Bankruptcy Case<br>No. 13-30340-DM<br><br>Chapter 7<br><br><br><br><br><br><br><br>Adversary Proceeding<br>No. 17-03057 |

**MEMORANDUM DECISION ON MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.    INTRODUCTION

By an order entered in the underlying chapter 7 case on March 1, 2017 (Dkt. No. 409), Qualcomm Incorporated ("Qualcomm") was given authority under § 503(b)(3)(B)[1] to object to certain claims

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

in this case and to seek affirmative relief.  Qualcomm filed a complaint ("Complaint") initiating this adversary proceeding on August 28, 2017.  The Complaint alleges sixteen claims for relief against defendants.  On October 17, 2017, Qualcomm moved for partial summary judgment regarding the tenth (non-assignability of chose in action), fourteenth (avoidance of lien under section 506(d)), fifteenth (post-petition lien ineffective under section 552) and sixteenth (declaratory relief as to all claims in Complaint) claims for relief (the "Motion").  Defendants North Water Intellectual Property Fund L.P. 3A, GBC HoldCo, LP, IP Successor Fund 21 L.P. and Lake Bridge Capital, Inc. (collectively "North Water") opposed the Motion as did defendants Jack B. Manning, Stephen D. Moore, R.C. Buford, The R.C. Buford 1997 Rev. Trust and J. Douglas Ripperto (collectively "the Manning Group").  No other defendant appeared in opposition to the Motion.

The court heard the arguments of counsel on November 14, 2017, and took the matter under submission.  For the reasons stated below, the court will grant the Motion as to the tenth, fourteenth, and fifteenth claims for relief.  There is no need for an order as to a portion of the sixteenth claim for relief at this time.

II. BACKGROUND

For several years debtors Gabriel Technologies Corporation, a Delaware corporation ("Gabriel") and Trace Technologies LLC, a Nevada limited liability company ("Trace" and together with Gabriel, "Debtors") prosecuted expensive litigation regarding alleged fraud, tortuous interference, misappropriation, infringement and other claims against Qualcomm and other defendants in the United States District Court for the Southern

District of California (the "Action"). That litigation was entirely unsuccessful and resulted in a judgment (affirmed on appeal) for Qualcomm in all respects and an award to Qualcomm of several million dollars in attorneys fees (also affirmed on appeal).

During various times during the litigation Debtors were represented by Hughes Hubbard & Reed ("HHR") and Wang, Hartman, Gibbs & Cauley PC ("Wang Hartman") and thereafter were represented by Chapin Fitzgerald Knaier, LLP, (k/n/a) Fitzgerald Knaie LLP ("Fitzgerald", and with HHR and Wang Hartman, the "Law Firms").

In order to finance the Action, Debtors entered into a series of complicated financing arrangements with various funders, including North Water and the Manning Group. Specifically, on September 2, 2011, they entered into a Note Purchase Agreement ("NPA"), pursuant to which North Water provided $3.1 million to finance Debtors' continued prosecution of the Action. The Manning Group's members advanced lesser amounts at various times. The NPA's choice of law provision selected New York and it was executed in California, where Debtors maintain their principal places of business.

The NPA included Section 7.1 which purported to secure all obligations of Debtors by granting to North Water, the Manning Group and others:

> " ... a continuing security interest in and Lien upon any recovery, whether by settlement, award, verdict judgment or other order, with respect to an IP Event (including, without limitation, all IP Event Proceeds), and all Accounts, Chattel Paper, Documents, Equipment, Fixtures, General Intangibles ... of [Debtors], whether presently owned or existing or hereafter acquired ... and all products and accounts thereof ...."

The NPA defines "IP Event" in Section 1 as:

> "[T]he recovery and/or receipt by [Debtors] ... of any amount paid by or on behalf of any Person, defendant or third party, ... which amounts related directly or indirectly to the Qualcomm Dispute, ...."

The NPA defines "IP Event Proceeds" in Section 1 as:

> [T[he aggregate amount of the proceeds ...with respect to an IP Event"

And in the same section, the NPA defines the "Qualcomm Dispute" as:

> "[W]ithout limitation, all claims asserted by [Debtors] in [the Action] <u>including any successor claim or any claim related thereto, derived therefrom or arising thereunder commenced or continued in any jurisdiction.</u>"

(emphasis added.)

The corresponding UCC-1 financing statements filed in Nevada and Delaware define the Qualcomm Dispute in the same manner except that the underscored language above was not included. The definition of IP Event is substantially the same, with stylistic changes to reflect that for the Nevada filing, Trace is the Debtor, while Gabriel is the Debtor for the Delaware filing.

Debtors filed chapter 11 on February 14, 2013. After this case was converted to chapter 7 on July 8, 2014, the chapter 7 trustee threatened or asserted legal malpractice and other claims (the "malpractice claims") against the Law Firms. She settled with HHR and Wang Hartman and the court approved those settlements by orders entered on September 21, 2016 (Dkt. Nos. 354 and 356). She may either settle or recover in the future from Fitzgerald. The money received by the trustee on the two approved settlements plus any future amount recovered from Fitzgerald are referred to as the "Settlement Proceeds".

The issue squarely presented by the Motion is whether North

-4-

Water and the Manning Group (or any other defendant properly before the court and served with the Motion) have a perfected lien on the Settlement Proceeds. For the reasons that follow, the court concludes that the NPA did not grant an enforceable lien on the Settlement Proceeds.[2] Further, if there was a lien only on the proceeds of the collateral specified in the NPA, those proceeds arose post-petition and may not be claimed by North Water or the Manning Group because of the bar of section 552.

III. DISCUSSION

**A. The NPA did not create a lien on the malpractice claims nor specifically the Settlement Proceeds.**

**1. The malpractice claims were non-assignable.**[3]

In its opening memorandum of points and authorities in support of the Motion, Qualcomm makes a passing reference in footnote 5 to the non-assignability of the malpractice claims under Nevada law. There is no other argument directed to this issue. In its Reply, however, Qualcomm devotes nearly five pages to the same issue. As North Water and the Manning Group did not object or seek leave to file a sur-reply directed to this issue, the court will address it here. In short, the law seems settled that the malpractice claims are non-assignable under California and Nevada law; that appears to be the law as applied here under

---

[2] If the lien is enforceable between either or both Debtors and North Water or the Manning Group, the court might need to decide whether it was properly perfected, and thus could defeat the claim of a trustee under section 544(a) as a hypothetical judgment lien creditor.

[3] Qualcomm stresses that the NPA only purported to grant a lien on any recovery with respect to an IP Event, yet much of its argument goes to whether there could be or was a lien on the malpractice claims themselves. The court will address both alternate theories in this memorandum.

-5-

New York law; the question appears open under Delaware law.[4] Whether proceeds of legal malpractice claims can be assigned as security is another matter, discussed, *infra.*

As a matter of California law, intangible property follows the location of its owner. *Kracht v. Perrin* (1990) 219 Cal. App. 3d 1019; Cal. Civ. Code § 946. The state of incorporation governs the applicable law concerning a corporation's intangible rights. *GP Credit Co. LLC v. Orlando Residents, Ltd.*, 349 F.3d 976 (7th Cir. 2003).

Under Nevada law, applicable to Trace, an assignment of a legal malpractice claim is barred. *Tower Homes, LLC v. Heaton* 377 P. 3d 118 (Nev. Sup. Ct. 2016); *Chaffee v. Smith*, 645 P. 2d 966 (Nev. 1992); *Sebok*, at n. 106.

If California law controls, public policy defeats a purported assignment of legal malpractice claim. *Jackson v. Rogers & Wells*, (1989) 210 Cal. App. 3d at 347-48, cited by *Kracht*, *supra* at 1027-28. *See*, also, *Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg* (1994) 30 Cal.App.4th 1373, 1379; *Hartford Cas. Ins. Co. v. J.R. Marketing, L.L.C.* (2015) 61 Cal.4th 988, 1006; *White Mountains Reinsurance Company of America v. Borton Petrini, LLP.*, (2013) 221 Cal. App. 4th 890 (summarizing California and out of state decisions and noting limited exception to this general rule of non-assignability where the assignment of the legal malpractice claim was only a small, incidental part of a larger commercial transfer).

---

[4]*See*, Anthony J. Sebok, *The Inauthentic Claim,* 64 Vand. L. Rev. 61, 85 n. 106 (2011) ("*Sebok*")(listing seventeen states (including California and Nevada) prohibiting assignment and seven (including New York) permitting it; Michael Reese, *The Use Of Legal Malpractice Claims Under The Revised UCC Article 9*, 20 Rev. Litig., 529 (2001)("Reese")

-6-

If New York law is considered, since that is the law chosen in the NPA, the result is the same, although a closer call. Here is what a New York court recently stated:

> Under New York law, absent language demonstrating an intent to do so, tort claims do not automatically pass to an assignee. *Fox v Hirschfeld*, 157 App Div 364, 368 (1st Dept 1913); see also *Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank*, 57 F.3d 146, 151 (2d Cir 1995) ("Under New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract"). There must be some demonstrated and direct intent to assign claims sounding in tort in an assignment, but New York law does not require any specific language to accomplish the transfer of tort causes of action. Rather, words are sufficient which show an intention of transferring such rights. *Commonwealth of Pennsylvania Pub. Sch. Employees' Retirement Sys. v Morgan Stanley & Co., Inc.*, 25 NY3d 543, 550 (2015); see also *Banque Arabe*, 57 F3d at 151—152

*Optimal Strategic U.S. Equity Ltd. v. SPV OSUS Ltd.*, 2017 NY Slip Op. 50284(U)

There was no such intent reflected in the NPA or anywhere else, so the court concludes that the assignment would be invalid notwithstanding the general statement of New York law cited in *Sebok*.

Gabriel is a Delaware corporation. Under the law of that state malpractice is solely a tort claim, not a contract claim. *Snavely Ex Rel. Snavely v. Wilmington Med. Ctr., Inc.* Civ. A. 82 C-SC-53, 1985 WL 552277, *3 (Del. Super. Ct. Mar. 18, 1985).[5] The malpractice claims do not depend upon a specific contractual provision but rather on the alleged impropriety of the Law Firms' conduct in their prosecution of the Action against

---

[5] Qualcomm cited this unpublished case that is a medical malpractice case, not about legal malpractice. It says nothing about assignability of the claim.

-7-

Qualcomm. The court will not speculate whether Delaware law would permit the malpractice claims to be assigned here.

**2. Whether or not assignable under applicable state law, no lien (or security interest) was granted in the malpractice claims.**

North Water argues that the plain language of the portions of the NPA quoted above encompass the malpractice claims because they relate, albeit indirectly, to the Action[6]. The court disagrees. To reach the conclusion sought by North Water, the court would have to conclude that malpractice committed by Debtors' counsel in connection with litigation against Qualcomm falls within the definition of the Qualcomm Dispute, viz., a "successor claim or any claim related thereto, derived therefrom or arising thereunder". Further, the Settlement Proceeds would have to fall within "IP Event Proceeds". That stretches the imagination and is circular in its reasoning because IP Event Proceeds by definition derive from an IP Event, which in turn relates to the Qualcomm Dispute, viz., the Action.

Taking a common sense and in-context approach proves the point. The whole reason and purpose of the NPA was to finance (successfully no doubt in the mind of the funders) Debtors' litigation against Qualcomm and to secure their entitlement to any recovery. Were it contemplated in any way that malpractice by any of Debtors' counsel would be a source of recovery, the documents would have reflected that possibility, although the possibility alone might have been enough for the funders and the Law Firms to abandon the entire effort. And the fact that HHR and Wang Hartman, when settling with the trustee, waived any such lien does

---

[6]Recall, the Action refers to the litigation commenced against Qualcomm by the Debtors.

-8-

not prove that they had one in the first place.  That waiver was likely more of a "belt & suspenders" provision of the settlement, consistent with the releases exchanged by the settling parties.

In short, the malpractice claims were not collateral under the NPA.[7]

**3. Even if the NPA extends to the malpractice claims, they were not adequately identified in the NPA or the financing statements.**

Whether or not assignable, the malpractice claims are "commercial tort claims" under UCC section 9-102)(a)(13).[8][9]  North Water argues that the contractual portions of the malpractice claims are general intangibles under the UCC.  That argument is unavailing, as UCC section 9-102(a)(42) excludes commercial tort claims from "general intangibles".

Where the parties disagree is whether those claims were in existence when the NPA was executed and whether they were

---

[7] Even if the NPA created a lien on the malpractice claims, the narrower definition of the Qualcomm Dispute in the financing statements may lead the court to conclude that the lien was not perfected as against a judgment lien creditor. *See, Nw. Acceptance Corp. v. Lynnwood Equip. Inc.*, 841 F. 2d 918 (9th Cir. 1988)(quoting *In re Durbin, Inc.* 46 B.R. 595 (Bankr. S.D. Fl. 1985)). But none of the sixteen claims in the Complaint asserts the strong-arm power of the trustee under section 544(a).  Thus the statement in Qualcomm's Reply to North Water's Opposition at 4:13-15, that it can avoid North Water's lien as a hypothetical lien creditor under section 544(b), while possibly true, is of no consequence absent such a claim in the Complaint.

[8] The provisions of the Uniform Commercial Code ("UCC") cited throughout this memorandum are the same in all four states that could be looked to for controlling law.

[9] Section 9-104(a) states:

(a) [Other law governs alienability; exceptions.] Except as otherwise provided in subsection (b) and Sections 9-406, 9-407, 9-408, and 9-409, whether a debtor's rights in collateral may be voluntarily or involuntarily transferred is governed by law other than this article.

-9-

adequately described, as required by UCC section 9-108(e).[10] Since the Action had been pending for years before the NPA, and the court had ordered Debtors to post an $800,000 bond because of serious doubts about the merits of their claims, at least some portion of the malpractice claims (or the operative facts giving rise to such claims) were in existence then. *Hassanally v. Republic Bank (In re Hassanally)* 208 B.R 46 (9th Cir. BAP 1997); *Watson v. Parker (In re Parker)*, 313 F. 3d 1267, 1269-70 (10th Cir. 2002).

But the second requirement presents more of a problem to North Water and the Manning Group, a problem they cannot overcome. North Water points to the Official Comments to UCC section 9-108(e), conceding that a mere description to the type of collateral is insufficient under the plain words of the section, but suggesting that the description need not be specific. The comment elaborates by stating that a description such as "all tort claims arising out of the explosion of debtor's factory" would suffice. Perhaps had the NPA included a grant of a lien on "all tort claims arising out of Debtors' prosecution of the [Action]", that would have sufficed. *Helms v. Certified Packaging Corp.*, 351 F. 3d. 675 (7th Cir. 2008). There is no mention of any such tort at all in the NPA.[11] Even the definition of the Qualcomm Dispute itself does not mention any tort at all, and certainly one cannot

---

[10]Section 9-108(e) states, in relevant part:

A description only by type of collateral defined in [the Uniform Commercial Code] is an insufficient description of:
(1) a commercial tort claim;

[11]Of course the Action itself was based upon various torts alleged by Debtors against Qualcomm and other defendants, but that focuses on the wrong torts.

-10-

infer a tort by any party not related to the defendants in the Action. Debtor's malpractice claims arose out of the conduct of its counsel, not the conduct of Qualcomm or any other defendant. The North Water argument that the NPA granted a security interest in any right of recovery related directly or indirectly to the Qualcomm Dispute will not carry the day. Under the "objective observer test" for sufficiency of collateral description (see *Parker v. Cmty First Bank* (*In re Bakersfield Westar Ambulance, 123 F. 3d 1243* (9th Cir. 1997); *In re Softalk Pub. Co. 856 F. 2d 1328 (*9th Cir. 1988), the description of collateral in the NPA was not sufficient to reach the malpractice claims.

**B. The proceeds of the malpractice claims came into existence after the bankruptcy petition and the North Water and the Manning Group claims of lien fail as they could not extend to post-petition property.**

Assuming the malpractice claims existed as of the date of the NPA, there is no doubt that the proceeds of those claims were not in existence. It is hornbook law that for a security interest to attach to proceeds of collateral, it must exist as to the original collateral before the proceeds were created. It is also clear that a lien on proceeds is different from a lien on the claim that may give rise to those proceeds. See, *Reese*, at 532.[12]

---

[12]Official comment 15 to UCC section 9-109(d)(12)(UCC not applicable to tort other than a commercial tort claim) provides, in relevant part:

> 15. Tort Claims. Subsection (d)(12) narrows somewhat the broad exclusion of transfers of tort claims under former Section 9-104(k). This Article now applies to assignments of "commercial tort claims" (defined in Section 9-102) as well as to security interests in tort claims that constitute proceeds of other collateral (e.g., a right to payment for negligent destruction of the debtor's inventory). Note that once a claim arising in tort has been settled and reduced to a contractual

-11-

For the reasons stated above, North Water and Manning Group did not have a lien on the malpractice claims. Thus, even stretching the language of the NPA to conclude that "IP Event Proceeds" could somehow mean the "proceeds" (as used in the UCC) of those claims, they did not exist when the NPA was executed nor when Debtors filed their chapter 11 cases. They came into existence only when the trustee settled with HHR and Wang Hartman; they do not exist even today as to the claim against Fitzgerald. Section 552[13] and UCC section 9-204(b) end the inquiry, and cut off any possible right North Water or the Manning Group may have to the Settlement Proceeds. The court has not been asked to apply section 552(b) and extend that purported lien based on "the equities of the case" nor can it imagine doing so given its decision that there is no lien to begin with.

## IV. DISPOSITION

Counsel for Qualcomm should prepare, serve and upload an order granting the Motion as to Claims ten, fourteen and fifteen

---

obligation to pay, (as in, but not limited to, a structured settlement) the right to payment becomes a payment intangible and ceases to be a claim arising in tort.
     This Article contains two special rules governing creation of a security interest in tort claims. First, a description of collateral in a security agreement as "all tort claims" is insufficient to meet the requirement for attachment. See Section 9-108(e). Second, no security interest attaches under an after-acquired property clause to a tort claim. See Section 9-204(b).

[13] Section 552(a) provides:

"Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

-12-

in the Complaint, against North Water and the Manning Group[14], for the reasons stated in the memorandum.

* * * END OF MEMORANDUM DECISION * * *

---

[14] The order may also name any other defendant that was properly served with the Complaint and a summons, or otherwise appeared, and the Motion.